**SENSYTROL CORPORATION, Plaintiff,**

v.

**RADIO CORPORATION OF AMERICA,** American Telephone & Telegraph Company, Westinghouse Electric Corporation and General Electric Company, Defendants.

United States District Court
S. D. New York.
Jan. 5, 1961.

Emil K. Ellis, New York City, for plaintiff. Robert W. Fiddler, New York City, of counsel.

Cahill, Gordon, Reindel & Ohl, New York City, for defendant Radio Corporation of America. James B. Henry, Jr., William K. Kerr, New York City, of counsel.

DAWSON, District Judge.

Sensytrol Corporation, assignee of Harry Dickens, has brought this non-jury action against the Radio Corporation of America and others, charging the defendants with infringing Patent 2,238,040 issued to Dickens (hereinafter referred to as the '040 patent) by the manufacture, use and sale of a type of radar equipment referred to as CR–101–A.

At the time of trial the only defendant remaining was Radio Corporation of America (hereinafter referred to as RCA). None of the other defendants has been served. The jurisdiction of this Court arises under the Patent Laws of the United States.

Plaintiff's initial claim was that Dickens had the basic patent on radar and that any device relating to transmitting or receiving radar signals infringes on his patent. Pursuant to this claim, on March 22, 1949, a complaint was filed against RCA, American Telephone & Telegraph Company, Westinghouse Electric Corporation and General Electric Company. The complaint contained two causes of action; the first relating to Patent 2,238,040 and the second to Patent 2,238,041. Since only RCA had been served the complaint was dismissed as against the other defendants at a pre-trial conference. At the same time it was stipulated that the second cause of action relating to the '041 patent would be eliminated. In addition to limiting the trial to one defendant and one cause of action arising out of one patent, the claim of the "basic radar patent" was dropped and the case was restricted to one for the infringement of "this particular patent ['040] on this particular circuit." [1]

The issues in the case are:

(1) Does the plaintiff hold a valid patent?

(2) If the plaintiff holds a valid patent, has the defendant RCA infringed that patent?

### The Inventor and the Scope of the Alleged Invention

On February 25, 1936, Harry Dickens applied for the '040 patent. Dickens is an American citizen who was brought up as a boy in Germany where his father was employed. He had the equivalent of a trade school education in Germany in a so-called technical institute. He was never engaged professionally in the electronic industry. While he was in Germany during the first World War he worked as a news photographer. At the end of the war he returned to the United States. At the time he was working on the proposed patent he was employed in a radio station in Washington, apparently as a kind of program director. He had some interest in electronics from his technical education. He was aptly described by his attorney during the trial as a "tinkerer."

One day in Washington he was discussing with some friends the incidence of automobile accidents and suggested

---

1. The Court: " * * * Is this the contention of the plaintiff, that this patent is the basic patent on radar?"

 Mr. Fiddler: "No, your Honor. 'Basic' is a sloppily used word—at least as it has been used in the record here, your Honor. What we are saying is that the circuit—let's just substitute 'primitive.' "

 The Court: "You are claiming merely this particular patent on this particular circuit?"

 Mr. Fiddler: "Correct, sir."

that a device might be constructed whereby an electromagnetic wave could be projected from an automobile, which when it came in contact with another moving object could set the brake and thereby prevent collisions. Dickens undertook to build a model of such a machine. It is that particular machine which is described in the '040 patent.

The patent had a long and difficult course through the Patent Office, including four rejections and seven amendments. Thirty-three of the claims of the original patent application were rejected and the patent covered only the last, or the thirty-fourth, claim.

The inventor admitted at the trial that there has been no commercial use of the device or of the circuit claimed to have been patented by him. He had manufactured none of the devices nor had he sold any of the devices. No licenses had been granted.

His expert witness, who appeared at the trial, testified that he had never seen the machine operate. During the trial an instrument built according to the '040 specification was brought into court but, upon demonstration, failed to work. While lack of commercial utility is not necessarily dispositive of a patent case, nevertheless it is a factor which may be taken into account in determining the validity of a patent.

The long and tortuous proceedings in the Patent Office were probably occasioned by the fact that the lack of technical education of the inventor in the rapidly developing field of radar and electronics left him unaware of the developments which had been made in the field.

The claim as finally granted, which is the only claim before the Court, reads as follows:

"A control for power circuits, comprising two substantially identical thermionic oscillators connected in parallel to each other, each oscillator including a grid circuit having a coil and a tuning condenser to a source of plate current supply, a relay interposed in the plate circuit between said source of supply and said oscillators, the grid circuit of one of said oscillators directing its radiant energy in a beam, said oscillators normally maintaining said relay in one position during unobstructed flow of radiant energy from the grid circuit, obstruction of said radiant energy flow reacting on the system to shift the energy distribution between the two oscillators and thereby cause a plate current change in each oscillator, whereby the change in plate current to the two oscillators causes operation of the relay to a different position."

By way of summarization the plaintiff has explained the '040 patent in his brief as follows:

"The '040 patent here involved relates to an electrical circuit utilizing radio waves for object detection purposes. The circuit disclosed by the patent * * * employs two oscillators A and B comprising appropriate tank circuits * * * coupled to a single antenna, and to a relay. Oscillator A generates a radio frequency signal which is sent out through the antenna for a short interval depending on the values selected for the grid leak circuit.

"As was pointed out at trial and as is well known in the prior art * * * the grid leak components * * * served to provide for periodic interruptions (or pulsing) of the oscillations of these oscillators.

"During the period of quiesence, the radio wave transmitted via the antenna and produced by oscillator A will upon striking an object be reflected therefrom to the antenna * * * whence the reflected signal induces a radio frequency in the antenna which is passed to a common conductor * * * joining oscillators A and B.

"Oscillators A and B are set up to beat against each other so that while one oscillator is quiescent the other is active and vice versa. During the period of quiescence of oscillator A

any signal reflected back to the antenna * * * will be mixed with the signal generated by oscillator B.

"Since there is a relative movement between the transmitting apparatus and any object detected there will be a variation of this reflected frequency from the initially transmitted frequency due to the doppler effect. The slight difference in frequency produced by the doppler effect on the reflected signals will reflect in a beat frequency in [the common conductor]. * * * as a result of the slight difference between the frequency of oscillator B and the doppler effected reflected signal. This beat frequency serves as an IF or intermediate frequency for actuation of the relay * * *."

■ It is not necessary to engage here in a detailed review of the claims, rejections and amendments which make up the 92 page file wrapper. Under the well-established doctrine of file wrapper estoppel cancelled claims are lost forever and the allowed claim cannot be construed to cover the scope of the cancelled claims.

On October 23, 1939 the Patent Office Examiner rejected all thirty-three claims on the basis of prior disclosures of the art. On May 30, 1940 the applicant withdrew these claims and proposed claim 34, which subsequently was allowed. In a letter preceding this amendment the attorney for the applicant said:

"Applicant has restricted the desired protection to the specific disclosure of the circuits * * *."

We therefore are faced with the problem of whether the particular circuits described in Claim 34, the only claim allowed in the patent, were revealed in the prior art.

### The Prior Art

The use of electromagnetic or radio waves for detection of objects through the air was known before Dickens. Hulsmeyer patent 13,170 (1904–British); Edwards patent 1,942,594 (1934); Alexanderson patent 1,969,537 (1934); Ballantine patent 2,020,347 (1935); Patterson patent 2,022,517 (1935).

The Edwards patents use a self-pulsing triode oscillator and oscillating circuit which operates 180° out of phase and a relay which is activated by imbalance within the system. The Ballantine patent adds, in addition to the preceding, a directional antenna.

Furthermore, Dickens' means of activating the relay had earlier been employed by Walter Schaffer, patent 1,717,-630 (1929) and Edward B. Mallory, patent 1,807,181 (1932).

The Mallory patent 1,870,181 (1932) was considered in detail by the Patent Office. As a result, twenty of the original claims were rejected and ultimately cancelled. Mallory invented a burglar alarm containing two triode thermionic oscillators. One of these has a fixed frequency, the other has an antenna such that when an object comes within range the frequency of the second oscillator is varied. Employing the superheterodyne principle, an intermediate frequency is created which is then rectified, thereby operating a loudspeaker or other indicator.

The specifications explain that Mallory employed two triode thermionic tubes of the Dickens' type, two oscillatory circuits of the Dickens' type and a single antenna. Oscillator B, as in Dickens, is maintained at a constant frequency. The following extract from the Mallory specifications is a reasonably fair statement of the Dickens' activation principle:

"The frequencies of these two thermionic tube oscillators are so chosen that the frequency of the beat note produced by their interaction in the sound producer * * * is either zero or at a frequency above or below audibility. If, however, the capacitance between the element 10 and the ground 23 is changed by a change in the dielectric between these elements, the frequency of oscillation of tube 1 will be altered and the constants of the circuit are so chosen that any change in this fre-

quency will give rise to an audible beat note * * *. When * * * the dielectric constant of the protected space is changed by the ingress or presence of a foreign agancy or object, the frequency of oscillation of tube 1 is changed sufficiently to give an audible signal."

Dickens finally differentiated his device from Mallory in the Patent Office by confining himself to two oscillators of identical frequencies and by pointing out that the Mallory machine had to be grounded to work, whereas his invention must necessarily not be grounded.

The type of circuit described by Dickens was anticipated in the Patterson patent (2,022,517) issued on November 26, 1935. This was a patent relating to a radio echo altimeter for use on aircraft to determine the altitude of the craft above the ground. The circuits were substantially the same as those described by Dickens. This patent was cited against Dickens in the Patent Office and was distinguished by Dickens' attorney in a communication dated April 23, 1940, in which he said:

"Wholly aside from the fact that Patterson may, in a manner, accomplish a similar result, the patent does not meet the specific claims now pending for, as the Examiner admits, in an official letter, Patterson has but one oscillator. The applicant has restricted the desired protection to the specific disclosure of the circuits and their details * * *."

Thus Patterson, which accomplished the same result, was distinguished on the ground that it employed one oscillator, while Dickens employed two. Whether use of two oscillators, rather than one, constitutes invention, may be open to question. We need not go into that for the Schaffer patent (1,717,630) filed on December 30, 1929, which preceded Dickens by almost ten years and which was not cited in the Patent Office,

showed a circuit almost identical with Dickens, and employing *two* coupled thermionic oscillators of constant identical frequency. The specifications of the Schaffer patent describe the relationship of the two oscillators along the lines of the description by Dickens.

Thus we have a situation here where the type of circuit involved was anticipated by the Patterson patent, but the Examiner apparently found a distinction in Dickens' use of two oscillators. However this feature was clearly anticipated by Schaffer, a fact of which the Examiner apparently was not aware. Thus there was in the application of Dickens no novelty; and no presumption of validity can arise from the patent grant if the Patent Office did not consider the Schaffer patent, which apparently it did not.

### Conclusion

The Court makes the following findings and conclusions:

1. This Court has jurisdiction of the parties and of the subject matter.

2. In order for a patent to be valid it is necessary that the inventor invent or discover something "new and useful." 35 U.S.C. § 101.

3. The claim allowed in the Dickens patent is not a claim for anything which was new at the time the claim was allowed. All of the elements of the circuit described therein were anticipated by the prior art. The patent is, therefore, invalid.

4. The complaint herein is dismissed with costs and reasonable attorneys' fees to be allowed to the defendant. Separate application shall be made for the amount of counsel fees to be allowed.

Since the patent is invalid, it becomes unnecessary to consider whether the radar apparatus manufactured by the defendant infringes the patent.

This opinion shall constitute the findings of fact and conclusions of law of the Court.